Noel *v.* Noel.

NOEL *vs.* NOEL.

1. A charge of adultery, with one C. F. S., in the city of Philadelphia, and with one or more persons in houses of ill-fame, in specified cities, being all the knowledge the complainant had at the filing of the bill, sufficiently particularizes the places and persons for the requirements of pleading.

2. The situation and circumstances of the mother being such that she is able to educate and rear her children, and her entire fitness, intellectually and morally, for the work, clearly, appearing, and in view of the immorality of the father, the custody of the children was awarded exclusively to the mother.

Argued before the Vice-Chancellor, on bill, answer, and proofs.

*Mr. Wilson*, for complainant.

*Mr. J. M. Scovel*, for defendant.

THE VICE-CHANCELLOR.

The parties to this suit for a divorce, were married in Philadelphia, on the 31st of August, 1869. The defendant, who belongs to a highly respectable family in Canada, where he was brought up, is a young man, and by profession a physician. The complainant is the daughter of Edward Harris, deceased, late of Moorestown, in the county of Burlington, in this state. At her marriage, she was living with her mother, then a widow, in the family residence at Moorestown. A few weeks afterwards, her husband took a house in Philadelphia, with a view to practicing his profession, but having little success, went back, in June, 1870, with his wife, to her mother's house, where she has since lived. He soon after engaged in mercantile pursuits, with moneys loaned by his mother-in-law, but did not succeed. He was addicted to intoxicating drinks, having occasional periods of excessive intemperance, and in March, 1872, was so far disabled and reduced by his courses, that his removal from Moorestown, and a year's stay with his relatives in Canada, were agreed upon as measures for reforming his habits and restoring his health. He left Moorestown April 5th, 1872, and has not since lived with complainant, who, soon after he had gone, was surprised by discovering, from his papers, and in other ways, the evidences of his guilt of adultery. On the 23d of July, 1872, she filed her bill of complaint. The alleged adulterous acts are with one C. F. S., in the city of Philadelphia; also, with one or more persons in Pottsville, Pennsylvania; also, with one or more persons in houses of ill-fame in Philadelphia; also, with some person in a house of ill-fame in New York, on his way from Moorestown to Canada. The times, places, and persons are alleged with as much certainty as the complainant was then able to state, and in these respects the pleading is sufficient.

The answer of the defendant is a general denial of the charges of the bill, and a large mass of testimony has been taken, and numerous exhibits offered. It is unnecessary, in

Noel *v.* Noel.

my judgment, to review, or even to refer to the largest part of the evidence. It will be sufficient to exhibit only so much of it, in general terms, as establishes conclusively the truth of some of the charges, and clearly entitles the complainant to the decree prayed for in her bill.

In respect to the illicit connection of the defendant with C. F. S., there is scarcely the semblance of a defence. Among the papers found in his secretary, soon after his departure for Canada, were fifteen of her letters, together with her photograph. The first of the letters is dated August 19th, 1869, eleven days before his marriage to the complainant. The last is dated March 26th, 1870, and sufficiently evinces the relations that had existed between the writer and himself.

" I left Philadelphia," she writes, " nearly a month ago. Constantly I found myself, in spite of myself, in the places that we had gone over together, and the place where you left me the last time, became a veritable place of torment. Why do I not know how to return contempt for contempt? You are right, however; your conduct is just. My love was in former times pure, and although I had not the right to love you, I ought not to blush for it. . . . . Now it is different, and I feel all the enormity of my fault. Perhaps I ought to suffer the consequences. I can no longer pity myself, for I, myself, in one of my letters, remember to have said to you, that if I succumbed, I would consent to receive your contempt. I feel the weight of it now, and it is only the heavier. You assured me (afterwards) that I need not be troubled; that you had been prudent, and that there would not be any consequences. I took you at your word, and have been without fear, up to the present moment. But I must confess to you the whole truth. I have not had my periods since I saw you. At the commencement of their disappearance, I felt no uneasiness, for I had never been entirely regular. But now three months and a half have gone. If I remember well, we saw each other the 15th of December ; and the last time that I was unwell was the 10th of

December. It has required a great effort in me to tell you this, but in face of the horrible truth, no false modesty can exist."

The unhappy writer continues in a similar strain, which need not be quoted. Her letters are admitted to be genuine, and the interview on the 15th of December, or thereabouts, to which she refers, is admitted to have occurred. His criminal conduct on that occasion is hardly denied. He affects, indeed, to doubt whether pregnancy was, in fact, the result of it, but his suggestions and pretences in regard to it are unworthy of notice. That he was guilty of adultery with the unfortunate writer of these letters, it is impossible to doubt.

Besides the letters thus carefully preserved, other evidences appeared from his papers, which, connected with the proofs in the cause, if they do not prove the licentiousness of his conduct, exhibit painfully the impurity and pollution of his mind. These evidences and proofs are obscene pictures and books. His fondness for them is spoken of as a mania by one of the witnesses, and no denial is attempted to be made of his habits respecting them. Samples of them have been offered as exhibits. They have no possible relation to medical purposes, and none can be pretended. The possession and use of them by a physician, are quite as incapable of apology or palliation—nay, more so—than they would be in the case of a vulgar, uneducated reader. They are of the worst conceivable kind, such as the law prohibits, and such as a mind of ordinary intelligence and virtue must instinctively recoil from with detestation and disgust. These obscene pictures and books the defendant is proven to have specially delighted in, to have exhibited to others, to have solicited aid in procuring, and to have introduced into the home of his wife.

The alleged adulterous acts in Pottsville are also established by plenary proof. They occurred in January, 1872. The defendant, as partner in a mercantile firm, went to Pottsville to collect debts due the firm. He put up at a public house, and spent the ten or twelve days he was there

in drunkenness and debauchery. The evidence upon this point is overwhelming, and leaves no room for hesitation or doubt. It consists of the testimony of William H. Crosby, the register clerk of the hotel; of John Smith, the head porter; of George W. Stockley, a clerk of the firm to which the defendant belonged; of George T. Chamberlain, long an intimate friend and associate of the defendant; and of the admissions of the defendant, himself. Crosby and Smith say that, on the evening of the defendant's arrival at Pottsville, he inquired for a house of ill-fame, was directed to one, and accompanied by Smith, the colored porter, to show him the house. He was in the same house on several occasions, while in Pottsville, and admits that he was there once with Chamberlain. His condition became such, in a few days after his arrival at the hotel in Pottsville, that the proprietor sent Crosby to Philadelphia to notify the defendant's friends of his state. Chamberlain went there, and after a few days, brought him home, suffering from the excesses in which he had indulged. He had with him, while there, obscene pictures and books. It is unnecessary to expose the details of what occurred at the hotel and in the house of ill-fame, as they appear in the evidence. Whatever doubt may exist as to particular facts, no doubt can exist that the defendant was there guilty of the crime of adultery with one or more of the prostitutes he visited. His general denial, in his testimony, is insufficient to stand against the weight and positiveness of the proofs. His own testimony must be read in the light of what he himself says in a letter to complainant, that his condition was such that he remembers but little of what he did do.

I shall not express an opinion as to the truth of the charges contained in the bill, respecting the adulterous acts in houses of ill-fame in Philadelphia and New York. A large part of the evidence is directed to what is charged to have occurred in Philadelphia. The characters and credibility of the witnesses who speak to it, were vehemently assailed at the argument, and evidently not without reason.

If the complainant's right to a decree rested on that evidence alone, it would by no means be clear. Some of the witnesses, who speak to this part of the case, and especially Chamberlain, were the defendant's associates and friends during that part of his married life before April, 1872. Whatever their vices and faults then were, they were no bar to his friendship and sympathy. Nor can I see in what way the defendant's case could be materially helped by accepting, as just, the denunciations he now makes of them. The charges that have been established against him, do not depend upon Chamberlain's evidence, and the indisputable facts of the case lend probability to evidence otherwise weak, pointing to the indulgence by the defendant, when opportunities presented, of the lusts which it seems to have been his study to foster and inflame.

The complainant is the mother, by the defendant, of two infant children: one, John V. Noel, born July 4th, 1870; another, Mary H. V. Noel, born February 17th, 1872. The bill prays that the marriage contract with her husband may be dissolved, and that the custody of the children may be awarded exclusively to her. There is every reason why both prayers should be granted. Her situation and circumstances in life are admitted to be such that she can educate and rear her two children, so far as pecuniary means are required, and nothing, whatever, appears in the voluminous evidence in the cause, to discredit her entire fitness, intellectually and morally, for the work. It is, on the other hand, most abundantly shown, by her letters to her husband and his mother, before she became aware of his true character and guilt, as well as after, by her testimony, and by all the evidence in the cause, that her qualifications are eminently such as to entitle her to the custody she asks.

I shall advise a decree in accordance with the above.